UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JULIAN ARREDONDO, Personal
Representative of the ESTATE OF
DANIEL SALAS,

    Plaintiff,

v.

HOWARD MILLER CLOCK CO.,

    Defendant.
_____/

CASE NO. 1:08-CV-103

HON. ROBERT J. JONKER

## OPINION

Plaintiff Julian Arredondo, personal representative of the Estate of Daniel Salas, brings this employment discrimination action against Defendant Howard Miller Clock Company ("Howard Miller") alleging violations of the Americans with Disabilities Act and the Michigan Persons with Disabilities Civil Rights Act.[1]  (First Amended Complaint, docket # 45.)  Defendant moves for summary judgment (docket # 28), arguing that Plaintiff has failed to identify any reasonable accommodation that would have allowed Mr. Salas to perform the essential functions of his position at Howard Miller.  The Court held a hearing to address Defendant's motion on August 4, 2009.

## BACKGROUND

Daniel Salas was a clock repair person at the Howard Miller factory in Zealand, Michigan. In January 2006, Mr. Salas had his right leg amputated due to complications from diabetes.  He took an extended leave of absence from Howard Miller while he recovered from the surgery and began

---

[1] Daniel Salas died during the pendency of this litigation.  Mr. Arredondo is the court-appointed representative of his estate.  (First Amended Complaint, docket # 45, at ¶ 4.)

rehabilitation therapy. During this time he received unemployment and short term disability benefits under a Howard Miller leave policy. He also applied for and received Social Security disability benefits. He still was receiving Social Security benefits at the time of his death in February 2009.

The Howard Miller leave policy allowed for six months paid leave. Mr. Salas was not fit to return to work six months after his amputation surgery, so he met with a Howard Miller benefits specialist and together they arranged to extend his paid leave of absence an additional three months by applying his unused vacation and personal days. In August 2006, Howard Miller informed Mr. Salas that all his available paid leave would exhaust on September 7 of that year. Salas reported to the Howard Miller factory on September 7, but the restrictions issued by his treating physician and supplied to Howard Miller stated he could not walk without a cane or lift while standing and that he could not bend, squat, stoop, carry at all. (Def.'s Br. in Supp., docket # 29, Ex. 2-7.) Based on these restrictions, Howard Miller concluded Mr. Salas was unable to perform the duties of his prior position, and it terminated him for that reason. (Pl.'s Br. in Supp., docket # 32, Ex. 5.) Indeed, Salas was still receiving Social Security disability benefits at the time based on his demonstrated inability to work.

**I.     The Duties of a Howard Miller Repair Person**

The repair person position at Howard Miller is a factory job. Mr. Salas inspected clocks on a conveyor belt and removed those clocks requiring repairs. He carried the clocks to a work bench where he would complete the necessary repairs. He would then place the repaired clock onto a skid for transport. The Howard Miller job description for the repair position states: "This position requires the incumbent to stand for prolonged periods of time. There is some light lifting, rubbing and similar exertion but the position does not ordinarily demand heavy/hard work."

Mr. Salas' sworn statements on his Social Security disability application and in his deposition testimony describe in further detail the physical demands of the repair person position. In his June 2006 Social Security application Mr. Salas indicated that he sometimes lifted clocks weighing up to sixty pounds, and that he frequently lifted clocks weighing ten pounds or more. (Def.'s Br. in Supp., docket # 29, Ex. 2.) He explained, "I had to lift various sizes of clocks from the line to my working station which was about 25 feet away and then carry it about 10 foot to the skid after I inspected it." (*Id.*) Mr. Salas' deposition testimony is somewhat inconsistent with certain aspects of his Social Security application, but the testimony confirms the physical nature of the repair person position. Mr. Salas testified that he typically stood or walked for eight hours each day, and that he carried clocks for distances ranging from at least five to fifteen feet. (Salas Dep. at 16-20.) He reiterated that he frequently lifted and carried clocks weighing ten pounds or more, and that he sometimes moved large grandfather clocks weighing up to sixty pounds. (Salas Dep. at 20-30.)

Mr. Salas' statements are consistent with other evidence in the record describing the repair person position. Mr. Salas' boss, Howard Miller Production Supervisor Mike Corwin, stated that "[t]he repair person position is a physical job that requires continuous bending, squatting, stooping, carrying and standing." (Corwin Aff. at ¶ 9.) Mr. Corwin confirmed that Salas would have to carry clocks from the conveyor line to the work bench, a distance of "up to 25 feet." (Corwin Aff. at ¶ 9.) Howard Miller Director of Human Resources Dave Sawyer testified that Howard Miller evaluated the possibility of accommodating Salas' restrictions, but "the extensiveness of the restrictions, the amount of activity involved with the position, the lifting, the carrying, virtually every one of these restrictions got to the heart of the essential functions of what Danny's position did." (Sawyer Dep. at 28.) Finally, Mr. Salas described the repair position in similar terms to his own physician,

Dr. Benjamin Bruinsma, and based on those statements Dr. Bruinsma concluded that Salas was not fit to return to work as of August 16, 2006. (Def.'s Br. in Supp., docket # 29, Ex. 2-4.) Dr. Bruinsma maintained this position as late as August 1, 2007, stating then that "At this time[,] at this point[,] I do not feel that he is able to return to his previous job as he described it." (*Id.*, Exhibit 2-8.) Approximately twenty months after Mr. Salas was terminated, he retained a vocational expert to assess whether he could, consistent with his physical limitations, perform the duties of a repair person at Howard Miller. Dr. James Pelt interviewed Mr. Salas and observed some employees on the job at Howard Miller. Dr. Pelt is not a physician, and he has never treated Mr. Salas. In response to Howard Miller's motion for summary judgment, Mr. Salas submitted a report and affidavit from Dr. Pelt. The report is difficult to understand. It splices generic excerpts from the Department of Labor's Dictionary of Occupational Titles with specific tasks or job descriptions ostensibly applicable to employees at Howard Miller. (*See* Pl. Br. in Supp., docket # 32, Ex. 6.) The report does not appear to contain any personal observations, yet ultimately Dr. Pelt concludes that Mr. Salas could perform the repair person position if he was allowed to sit on a rotating stool. However, Dr. Pelt's assessment of Plaintiff's physical capabilities is based on a "Physical Capacities Evaluation" signed by Dr. Bruinsma more than one and a half years after Mr. Salas was terminated. (*Id.*) The physical limitations described in this document are significantly less severe than the restrictions ordered by Dr. Bruinsma in August 2006 and in effect when Mr. Salas attempted to return to work.

Dr. Pelt's affidavit, dated eight months after his report, purports to summarize the essential duties of the repair person position based on his own personal observation of Howard Miller employees. (*See* Pelt. Aff., docket # 33, at ¶ 7.) However, much of his description of the job directly

contradicts Mr. Salas' prior sworn statements about the work he performed at Howard Miller. For example, Dr. Pelt states that a repair person takes just "two steps" in moving a clock from the conveyor line to the work bench, but Salas stated in his deposition and Social Security application that he walked fifteen or twenty-five feet to perform that task. Dr. Pelt also states the clocks weigh "about five pounds," but Plaintiff testified they weighed at least twice that amount. (*Compare* Pelt. Aff. at ¶ 7, *with* Salas Dep. at 16-30.) In the affidavit, Dr. Pelt reiterates his ultimate conclusion that a rotating stool would be an effective accommodation for Mr. Salas, at least as of January 2009.

## II.     Mr. Salas' Communications with Howard Miller While on Leave

Mr. Salas underwent surgery on January 10, 2006. His immediate supervisor at Howard Miller, Mike Corwin, visited him in the hospital following the surgery but did not hear from him again until Mr. Salas attempted to return to work on September 7, 2006. The company benefits specialist, Muriel Brower, came to Mr. Salas' home on August 2, 2006 to discuss his eligibility for extended leave and his potential return to Howard Miller. Mr. Salas still was in a wheelchair at that time because he had not yet been fitted with a prosthetic leg. Ms. Brower informed Mr. Salas and his wife that to keep his job at Howard Miller he would need to return to work by September 7 because that was when his leave expired. Mr. Salas did not affirmatively indicate to Ms. Brower whether he would or would not return to Howard Miller on September 7.

Two weeks later, Salas obtained a list of medical restrictions from his treating physician, Dr. Benjamin Bruinsma. Those restrictions, dated August 16, 2006, stated, "no walk without cane, no bend, squat, stoop, no carry, no stairs without rail, no ladder use, no unprotected heights, no lift while standing." (Def.'s Br. in Supp., docket # 29, Ex. 2-3.) In a progress report recorded that same

day, Dr. Bruinsma wrote, "At this point, I do not feel he is able to go back to his job." (*Id.*, Ex. 2-4.) Salas testified that he agreed with Dr. Bruinsma's assessment at that time. (Salas Dep. at 52.)

Mr. Salas and his wife delivered the restrictions to Howard Miller later that same day. On August 30, Dr. Bruinsma faxed to Howard Miller a revised note stating that Mr. Salas "may return to work with restrictions." (*Id.*, Ex. 2-7.) The restrictions on the August 30 note are nearly identical to the restrictions on the August 16 note. Even though Dr. Bruinsma cleared him to return to work with restrictions, Mr. Salas testified that he knew he could not return to work with a cane, presumably because the floors in the Howard Miller factory were slanted and waxed to allow employees to push the large grandfather clocks from one end of the factory to the other. (*See* Salas Dep. at 20-22, 46-47.) Nevertheless, Mr. Salas had no further contact with Dr. Bruinsma or Howard Miller until the day he attempted to return to work, September 7, 2006. (Salas Dep. at 68.)

When Mr. Salas returned to Howard Miller he spoke with Mike Corwin and another Howard Miller supervisor, Curt Berkompas. Mr. Salas told them he was "ready to go back to work," but all parties in this case agree that Mr. Salas' medical restrictions prohibited him from bending, squatting, stooping, carrying, lifting while standing, or walking without a cane. (Salas at 69-70.) Mike Corwin asked Salas whether he could think of any job he could perform consistent with Dr. Bruinsma's restrictions, and Salas could not think of any. (Corwin Aff. at ¶ 6.) Mr. Salas later suggested to Curt Berkompas that he could perform the duties of a repair person, if another employee lifted and carried the clocks to and from his work station. (Salas at 71-72.) This was the first time Mr. Salas requested any disability accommodation from anyone at Howard Miller. (Salas at 76.)

On or before September 7, 2006, Corwin and Berkompas reviewed Mr. Salas' medical restrictions and discussed amongst each other whether there were any reasonable accommodations

that would allow Salas to continue working at Howard Miller. (Corwin Aff. at ¶¶ 5, 8, 10.) They could think of none, and Salas' only suggested accommodation was to have someone else lift and carry clocks for him. Accordingly, Howard Miller terminated Mr. Salas in a September 8, 2006 letter stating, "the extensive work restrictions that have resulted from your medical situation are ones that we just cannot work with, as we have no productive work that is consistent with these restrictions." (Pl. Br. in Supp., docket # 32, Ex. 5.) Howard Miller Director of Human Resources Dave Sawyer concluded the letter by noting, "It gives me no pleasure to reiterate this message, Danny, and I truly hope that your restrictions and medical situation change someday. . . . We certainly do appreciate your many years of service with Howard Miller, and we wish you and your family well in this difficult chapter of your life." (*Id.*) Mr. Salas filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), and subsequently filed this lawsuit.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Jones v. Potter*, 488 F.3d 397, 402 (6th Cir.2007); FED. R. CIV. P. 56. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The ultimate question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**ANALYSIS**

Plaintiff alleges Howard Miller violated the Americans with Disabilities Act ("ADA") and the Michigan Persons with Disabilities Civil Rights Act by failing to provide Mr. Salas with a reasonable accommodation for his disability, and by failing to discuss with Mr. Salas whether such accommodation might be available. (First Amended Complaint, docket # 45.) Howard Miller moves for summary judgment (docket # 28) on the grounds that it properly evaluated all possibilities, but there was no reasonable accommodation available in September 2006 that would have allowed Mr. Salas to perform the essential functions of the repair person position.[2] Both parties agree that the state and federal disability discrimination liability standards are the same. *See*, *e.g.*, *Collins v. Blue Cross Blue Shield of Mich.*, 228 Mich. App. 560, 568 (1998). Accordingly, the Court's analysis focuses solely on the text of the ADA and the cases and administrative regulations interpreting it.

**I.  Threshold for Protection Under the ADA**

The ADA requires employers to make reasonable accommodations for the known mental or physical limitations of a "qualified individual" with a disability. 42 U.S.C. § 12112(a); *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007). There is no doubt Mr. Salas was disabled. His leg was amputated below the knee, and he was "substantially limited" in major life activities such as walking, standing, and lifting. *See* 42 U.S.C. § 12102. The question in this case is whether on this record a reasonable jury could find that Mr. Salas, despite his disability and the associated medical restrictions issued by his doctor, was qualified to perform the essential duties of the repair

---

[2] Plaintiff does not allege that there was another position available at Howard Miller in September 2006 that he could have performed with or without a reasonable accommodation. The ADA does not require that an employer reassign an employee to a position that is not vacant. *Smith v. Ameritech*, 129 F.3d 857, 867 (6th Cir. 1997); *see also* 29 C.F.R. § 1630.2(o)(2)(ii).

8

person position with or without a reasonable accommodation at the time Howard Miller terminated him in September 2006. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996).

## II. Mr. Salas Could Not Perform the Essential Functions of the Repair Person Position

A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Plaintiff argues Mr. Salas could have performed all the essential functions of the repair person position if Defendant would have provided him with a rotating stool. Defendant counters that lifting, carrying, walking, and reaching all are essential functions of the repair person position, and that Plaintiff could not adequately perform those functions even with a stool. Plaintiff does not and cannot argue Mr. Salas could perform these functions in September 2006. There is no dispute that, at that time, his doctor's restrictions prohibited him from walking without a cane, bending, squatting, stooping, carrying, or lifting while standing. *See Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 383 (6th Cir. 1998) (holding that an employer is entitled to rely on medical restrictions provided by the employee to determine whether reasonable accommodating is possible). Accordingly, the issue is wether these functions were "essential" to the repair person position.

A job function is essential if "its removal would fundamentally alter the position." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001). The EEOC's interpretative guidelines list seven non-exhaustive factors a court should consider when assessing whether a given job duty is "essential": (1) an employer's judgment; (2) the written job description; (3) the amount of time on the job devoted to performing the function; (4) the consequences of not requiring the employee to perform the function; (5) the terms in a relevant labor agreement; (6) the work experience of those who have held the position in the past; and (7) the current work experience of those who hold similar

9

jobs. 29 C.F.R. § 1630.2(n)(3); *Brickers v. Cleveland Bd. Of Educ.,* 145 F.3d 846, 849 (6th Cir. 1998). Usually the essentiality of a given function is a question of fact, *Brickers*, 145 F.3d at 849, but "nothing prevents a court from resolving a summary judgment motion on the basis of such a fact-specific determination when the evidence before the court pertinent to essentiality does not conflict, insofar as the non-moving party has failed to create a genuine issue of material fact." *Brown v. Chase Brass & Copper Co.*, 14 Fed. Appx. 482, 489 (6th Cir. 2001).

In this case, there is no genuine issue of fact as to whether standing, walking, lifting, carrying, stooping, squatting, and crouching, were essential functions of the repair person position. Mr. Salas' own sworn statements indicate he frequently lifted, pushed, or carried clocks weighing between ten and sixty pounds. (Salas Dep. at 20-30.) He spent almost the entire work day–six to eight hours–standing to repair clocks or walking five to twenty-five feet to retrieve broken clocks from the conveyor belt or place repaired clocks on a skid. (Salas Dep. at 16-20; Def.'s Br. in Supp., Exhibit 2-2.) He had to stoop, squat, or crouch to retrieve clocks from the lower tier of the conveyor belt, and reach up for clocks on the higher tiers. (Salas Dep. at 16-22.) Mr. Salas' described the position in similar terms to his treating physician, Dr. Bruinsma, and Salas' account of his daily duties is consistent with the testimony of his supervisor, Mike Corwin, and Howard Miller's Director of Human Resources, Dave Sawyer. Moreover, Salas himself testified that he knew he could not return to work with a cane, and that he could not perform the repair person position unless someone else lifted and carried the clocks to and from his work station for him. (Salas Dep. at 46-47, 71.)

Plaintiff argues the Court should disregard the sworn statements of Mr. Salas and his former colleagues because the Howard Miller written job description and Dr. Pelt's expert report and affidavit indicate that none of the physical requirements of the job were "essential." This argument

is without merit. The written job description expressly states that the repair person position requires "lifting, rubbing, and similar exertion," and also "prolonged periods" of standing. (Pl.'s Br. in Supp., docket # 32, Ex. 2.) The description also implicitly contemplates that the repair person will carry clocks to and from the conveyor lines and skids by stating that the person must "[r]eturn approved clocks to the pack line according to acceptable quality limits established for the department." (*Id.*) Plaintiff is correct that the description does not specifically state the weight of the clocks to be carried, the distances to be traversed, or that stooping, squatting and crouching are required, but nothing in the description contradicts any of the other evidence in the record supporting the essentiality of those job functions. *See Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988) (noting that the essentiality of a given function "should be based upon more than statements in a job-description and should reflect the actual functioning and circumstances of the particular enterprise involved"). Moreover, the description itself notes it is "not [an] exhaustive list[] of all duties, responsibilities, knowledge, skills, abilities, and conditions associated with the job."

Dr. Pelt's report and affidavit are similarly unavailing for Mr. Salas on this record. Dr. Pelt conducted a brief "job site analysis" at Howard Miller, but many of his conclusions about the repair person position directly contradict Mr. Salas' own sworn statements. Dr. Pelt states that the repair person takes "two steps" in removing a clock from the conveyor line, transporting it to the work bench, and placing it on the skid. Mr. Salas stated in his Social Security application that he walked twenty-five feet to perform this task, though he later testified in his deposition the correct distance was closer to fifteen feet. Either way, Dr. Pelt's observation is irreconcilable with Plaintiff's own sworn statements. Additionally, Dr. Pelt states that the clocks "are not heavy weighing only about five pounds." This statement too is irreconcilable with Plaintiff's assertion that the clocks averaged

ten pounds, and could weigh up to sixty pounds. Dr. Pelt's affidavit is dated more than five months after Plaintiff's deposition, and almost two months after Howard Miller moved for summary judgment. It is well settled law in this Circuit that "[a] party cannot create a factual dispute by filing an affidavit, after a motion for summary judgment has been made, which contradicts earlier deposition testimony." *Dotson v. U.S. Postal Serv.*, 977 F.2d 976, 977 (6th Cir. 1992) (per curiam); *see also Demerrell v. City of Cheboygan*, 206 Fed. Appx. 418, 427 (6th Cir. 2006) ("Expert testimony, however, is inadmissible when the facts upon which the expert bases his testimony contradict the evidence." (quoting *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999)).

Plaintiff makes no attempt to explain the discrepancy between Mr. Salas' sworn statements and Dr. Pelt's apparent observations. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ("[A]n ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation."); *accord Williams v. London Utility Comm.*, 375 F.3d 424, 429 (6th Cir. 2004). Moreover, even under Dr. Pelt's characterization of the repair person position, Mr. Salas still would have had to lift, carry, and walk, and Dr. Pelt's affidavit does not indicate one way or the other whether the job involved stooping, squatting, or crouching. (*See* Pelt Aff. at ¶ 6.) Given the uncontroverted evidence in the record, including Mr. Salas' own sworn statements, regarding the frequency and significance of these tasks in the repair person position, Dr. Pelt's report and affidavit are insufficient to create a material issue of fact as to whether Plaintiff could perform the essential functions of that position.[3] *See*

---

[3] After summarizing his understanding of the essential functions of the repair person position, Dr. Pelt goes on to conclude that Mr. Salas was, at least as of January 2009, physically capable of performing those essential functions with a reasonable accommodation. Dr. Pelt's assessment of Plaintiff's physical capabilities is based at least in part on a written list of physical limitations for Mr. Salas that is significantly less severe than the medical restrictions in place when Mr. Salas

*Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 635 (6th Cir. 1999) (disregarding an expert's "unsupported opinion" on plaintiff's physical abilities in light of other, uncontradicted evidence in the record).

On this record, the Court finds that standing, walking, lifting, carrying, stooping, squatting, and crouching were essential functions of the repair person position. There is no factual dispute that, at the time Mr. Salas' leave exhausted, his doctor's medical restrictions prohibited him from engaging in these activities. The only accommodation suggested by Plaintiff in response to Defendant's summary judgment motion–that Mr. Salas be provided with a rotating stool–would have been ineffective because it would not have allowed Mr. Salas to perform all or even most of the essential functions of the repair person position. Moreover, the ADA does not require an employer to eliminate essential functions of position to accommodate a disabled individual. *Bratten*, 185 F.3d at 632; *see also* 42 U.S.C. ¶ 12111(8). Accordingly, Mr. Salas was not "a qualified individual" at the time Howard Miller terminated him, and thus Howard Miller is entitled to summary judgment in its favor on Plaintiff's claim that Howard Miller failed to provide a reasonable accommodation.

### III. Howard Miller is Not Liable for Failing to Engage in the Interactive Process

Plaintiff also alleges Howard Miller violated the ADA by failing to "engage in an interactive process" with Mr. Salas to determine if a reasonable accommodation was possible. (Amended Complaint, docket # 45, at ¶ 21.) The statutory text of the ADA does not contain any "interactive process" requirement, but the EEOC regulations interpreting the term "reasonable accommodation"

---

attempted to return to Howard Miller in September 2006. Plaintiff fails to explain how Dr. Pelt's assessment of Mr. Salas' abilities in April 2008 bears on the issue of whether Mr. Salas could have returned to work in September 2006. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996) (noting the plaintiff must show she "was a 'qualified individual with a disability' *at the time of the discriminatory act*") (emphasis in original).

state: "To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). This regulation is entitled to deference under *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

On a facial reading of the statutory text and the EEOC regulation, the Court's ruling that Mr. Salas was not a "qualified individual" should be dispositive of the interactive process requirement. The ADA prohibits discrimination against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The EEOC regulation imposes a duty upon employers to engage in an interactive process with "qualified individual[s]." 29 C.F.R. § 1630.2(o)(3); *see also Breitfelder v. Leis*, 151 Fed. Appx. 379, 386 (6th Cir. 2005) (holding that employer has no duty to engage in the interactive process where the employee cannot show he or she could have been reasonably accommodated); *Denczak v. Ford Motor Co.*, 215 Fed. Appx. 442, 445-46 (6th Cir. 2007) (same). Mr. Salas was not a "qualified individual" because he could not perform the essential functions of his position even with a reasonable accommodation. Thus under a plain reading of the statutory text and the EEOC regulations, Howard Miller cannot be liable for failing to engage Mr. Salas in an interactive process.

The published Sixth Circuit case law interpreting the interactive process requirement does not directly address the question of whether the employee must prove he or she is qualified in order to receive the benefit of the interactive process. *See, e.g.*, *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 872 n. 6 (6th Cir. 2007) (declining to reach the issue because the employee failed to establish that the employer was at fault for the breakdowns in the process). However, *Kleiber* and other published decisions appear to treat the interactive process as a separate and distinct basis for liability

under the ADA. *See id.* at 871 ("[T]he interactive process is mandatory, and both parties have a duty to participate in good faith."); *accord Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 557 (6th Cir. 2008). But even these cases recognize that the scope of the interactive process requirement varies with the facts of the case. *See Kleiber*, 485 F.3d at 871 (noting that where the process breaks down, the court "should attempt to isolate the cause of the breakdown then assign responsibility").

There is no standard, one-size-fits-all interactive process that will work for all parties in all situations. However, the case law and interpretive guidance from the EEOC do delineate some broad parameters. As a general rule, the employee must request a reasonable accommodation to trigger the employer's duty to engage in the interactive process. *See Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 258-59 (6th Cir. 2000). An accommodation is not "reasonable" if it requires the employer to totally eliminate essential functions of the position. *Id.*; *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999). On the other hand, the employer must make "reasonable accommodations" to enable the disabled employee to perform the essential functions of the job. *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1078 (6th Cir. 1988). The regulatory definition of "reasonable accommodation" is very broad and could include job restructuring, modification of equipment, devices, or facilities, and modifications "to the manner or circumstances under which the position held or desired is customarily performed." 29 C.F.R. § 1630.2(o); *see also* 42 U.S.C. § 12111(9).

The range of particular scenarios that are possible within these general rules is so broad that generalizations, in either direction, cannot carry the day when assessing the interactive process requirement. Rather, a fact-specific analysis of each case is necessary to determine whether both parties have meaningfully assessed the functional limitations and capacities of the employee, the actual requirements of the work that needs to be done, and the reasonably possible ways of aligning

15

the two. On this record, the interactive process was, as even Howard Miller conceded at oral argument, not the model process envisioned in the EEOC's interpretative guidance regulations. *See* 29 C.F.R. Pt.1630, App. "(This process of identifying whether, and to what extent, a reasonable accommodation is required should be flexible and involve both the employer and the individual with a disability."). However, considering all the circumstances of the case, the Court believes the process passes statutory muster such that Howard Miller is entitled to summary judgment in its favor.

Mr. Salas has never been cleared by Dr. Bruinsma or any other physician to perform the work required of a repair person at Howard Miller. At the time he was terminated Mr. Salas could not bend, squat, stoop, carry, lift while standing, or walk without the aid of a cane. Almost a full year after his termination, his treating physician still maintained "I do not feel that [Mr. Salas] is able to return to his previous job as he described it." (Def.'s Br. in Supp., docket # 29, Ex. 2-8.) Howard Miller knew the severity of Mr. Salas' restrictions at the time he attempted to return to work, and it had a right to rely on those restrictions when assessing whether Mr. Salas still could have worked at the Howard Miller factory. *See Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 383 (6th Cir. 1998) ("When employees (and/or their physicians) represent that they are 'totally disabled,' 'wholly unable to work,' or some other variant to the same effect, employers and factfinders are entitled to take them at their word." (quoting *Weigel v. Target Stores*, 122 F.3d 461, 467-68 (7th Cir. 1997)). And given the severity of the restrictions, Howard Miller's inquiry into possible accommodations was understandably limited. There are few, if any, jobs on a factory floor that do not require at least some degree of physical exertion, even if the employee is allowed to sit on a stool when performing the more skilled aspects of the factory job. Mr. Salas clearly understood this point. He testified in deposition that it was a "no-no" to come back to work with a cane, and he admitted to his supervisor

that he could not think of any job he could perform consistent with his medical restrictions. (Salas Dep. at 46-47; Corwin Aff. at ¶ 6.) Even under Dr. Pelt's characterization of the repair person job, the position required some work Mr. Salas could not do: namely, lifting clocks from a conveyor line and carrying them at least some distance to a work bench and then to a skid.

Perhaps more important than the severity of Mr. Salas' restrictions is the timing with which he presented them to Howard Miller and asked for accommodation. Mike Corwin visited Mr. Salas in the hospital immediately following the amputation surgery, but he did not hear from him again until the day Mr. Salas attempted to return to work, almost eight months after the surgery. Even when Howard Miller benefits specialist Muriel Brower visited Mr. Salas in his home in August 2006 Mr. Salas did not indicate whether he would be returning to work the following month. He first communicated a list of medical restrictions to Howard Miller just three weeks before his leave was set to expire. At that time, Mr. Salas already had exhausted all available leave under Howard Miller's short-term leave policy, and he already was receiving Social Security disability benefits.

When Mr. Salas unexpectedly reported to work on September 7, Howard Miller management personnel already had discussed his restrictions and determined that no accommodation was possible. (Sawyer Dep. at 26-28; Corwin Aff. at ¶¶ 5, 7-11.) Mr. Salas did nothing to disabuse Howard Miller of this notion. He first informed Mr. Corwin that he could think of no job he could perform, and he later suggested to Mr. Berkompas that he could work as a repair person, but only if someone else lifted and carried the clocks for him. This was the first time he suggested any accommodation to anyone at Howard Miller. Not only have courts "continuously found that employers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his

17

disability," *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 635 (6th Cir. 1999), but even if some job restructuring was theoretically possible, Mr. Salas did not provide Howard Miller with sufficient notice to evaluate fully that possibility. All Mr. Salas' available leave was exhausted on the date he attempted to return to Howard Miller. He could not perform the job as it then existed. Given the severity of his medical restrictions and the timing of his request for accommodation, the Court cannot say that Howard Miller acted in bad faith in informing Mr. Salas that management already had considered his restrictions and determined that no reasonable accommodation was possible. *See Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007) (granting summary judgment in favor of employer where employee failed to show that employer's bad faith caused the interactive process to break down); *Breitfelder v. Leis*, 151 Fed. Appx. 379, 386 (6th Cir. 2005) ("[T]he employer fails to participate in the interactive process only if, among other things, the employee can demonstrate that 'the employee could have been reasonably accommodated but for the employer's lack of good faith.'" (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 320 (3d Cir. 1999). Consequently, under these circumstances, Howard Miller is entitled to summary judgment in its favor on Plaintiff's claim under this prong of the ADA.

**CONCLUSION**

Defendant's motion for summary judgment (docket # 28) is granted. Plaintiff is not a "qualified individual" within the meaning of the Americans with Disabilities Act, and Howard Miller is not liable for failing to engage in the interactive process as contemplated in the EEOC regulations.

Dated: September 2, 2009        /s/ Robert J. Jonker
                                ROBERT J. JONKER
                                UNITED STATES DISTRICT JUDGE